# United States District Court
# Northern District of Indiana
# Hammond Division

| | |
|---|---|
| JEFFREY R. SANCHEZ,) | |
| ) | |
| Plaintiff,) | |
| ) | |
| v.) | Case No.: 2:07-CV-428 JVB |
| ) | |
| MICHAEL ASTRUE, COMMISSIONER) | |
| OF SOCIAL SECURITY,) | |
| ) | |
| Defendant.) | |

## OPINION AND ORDER

Plaintiff Jeffrey Sanchez seeks judicial review of the final decision of the Defendant Commissioner of Social Security who denied his application for Disability Insurance benefits and Supplemental Security Income benefits under the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

## A. Procedural Background

On April 30, 2005, Plaintiff filed an application for Disability Insurance and Supplemental Security Income benefits, alleging disability since September 28, 2004. Plaintiff's application was denied on August 15, 2005, and also upon reconsideration on November 7, 2005. In December 2006, Plaintiff filed a timely request for a hearing, which was held on December 21, 2005. Plaintiff and his attorney, James Balanoff, appeared at the hearing in Gary, Indiana, before Administrative Law Judge John Meyer. Drs. Ashok Jilhewar and Robert Coyle, both medical experts, and Thomas A. Grzesik, a vocational expert, testified at the hearing. In a decision dated February 23, 2007, the ALJ denied Plaintiff's application finding that the Plaintiff is not entitled to a period of

disability or Disability Insurance benefits or Supplemental Security Income benefits under the Social Security Act. The ALJ found as follows:

> 1. The claimant met the insured status requirements of the Social Security Act through December 31, 2005.
>
> 2. The claimant has not engaged in substantial gainful activity since September 28, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3. The claimant has the following severe combination of impairment: major depression with anxiety (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, I find the claimant has no exertional restrictions. From a nonexertional standpoint, however, he is moderately limited in ability to understand, remember and carry out detailed instructions; perform activities within a schedule; maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in a work setting.
>
> 6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
>
> 7. The claimant was born on August 18, 1963, and was 41 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
>
> 8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).
>
> 9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant is not under a disability, as defined in the Social Security Act, anytime since September 28, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The Plaintiff filed a timely Request for Review with the Social Security Administration Appeals Council. On August 31, 2007, the Appeals Council denied the Plaintiff's Request for Review, making the ALJ's decision the final decision of the Commissioner.

**B. Factual Background**

**(1)** *Preliminary Events*

Plaintiff was born on August 18, 1963. He graduated from Indiana State University with a bachelor's degree in criminology in 1985. Plaintiff served in the Marine Corps from 1983 until 1989. After that, he joined the City of East Chicago Police Department. He honorably performed his duties as a police officer for the City of East Chicago until sustaining a nervous breakdown on September 28, 2004. At St. Catherine's Hospital in East Chicago on September 29, 2004, Dr. Epifanio G. Sandoval recorded Plaintiff's account of the events which led to his hospitalization:

> The patient is a 41-year-old white male with no past psychiatric history. He relayed that 1–2 days prior to admission, while he was talking to a neighbor, he did not know where he was. He was asking his neighbor where he was, whether he was in heaven or whether he was in hell. The neighbor was scared but he continued to talk with him. He also asked the neighbor if her son was there, but the neighbor's son died of suicide a long time ago. The patient was the one who was called during the son's suicide. He also recalls when a friend pulled up from the street, he called him a

3

devil. There was a lot of confusion at this time and he was brought to the Emergency Department.

During the past two weeks prior to admission, he claims that he was working doubles, 17 hours every day, to cover for a friend who was attending some school or training. During those times, he drank a lot of coffee and he was stressed and exposed to some crisis like shootings, suicides, and he had to work very hard. He admits to some anxiety wherein he was very worried, very nervous and with heart palpitations.

(TR. 118.)

**(2)** *Medical Evidence*

As noted above, in September 2004, the Plaintiff had a nervous breakdown. He was taken to St. Catherine's Hospital on September 29, 2004, where Dr. Sandoval diagnosed Plaintiff with a psychotic disorder, not otherwise specified, and anxiety disorder. (TR 119–20.) He assigned Plaintiff a Global Assessment of Functioning (GAF) score of 55.[1] (TR 120.)

Plaintiff first saw his treating psychiatrist, Dr. Eugene Chang-Kyoo Kang, at Tri-City North Lake Counseling Center, in January 2005. During the initial psychiatric evaluation on January 11, 2005, Dr. Kang diagnosed Plaintiff with major depression, single episode, with complaints of significant anxiety symptoms, and assigned a GAF of approximately 50.[2] (TR. 147.) Plaintiff complained of anxiety that caused "racing and repetitive thoughts" and chest pain. He also indicated that he had "problems with motivation, a poor appetite, decreased concentration, forgetfulness and decreased enjoyment." (TR. 145.) Dr. Kang noted that Plaintiff was normal, coherent, relevant, and

---

[1] A GAF of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (DSM-IV-TR) 34 (2000).

[2] A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. *DSM-IV-TR* at 34

4

goal oriented yet had a depressed mood throughout the examination. Dr. Kang concluded the evaluation by referring Plaintiff for individual counseling.

In February 2005, Plaintiff complained to Dr. Kang of feeling sad and helpless, with blurred vision and sexual dysfunction while on his medication. Dr. Kang adjusted the medication and the vision and sexual side effects went away. In April 2005, Plaintiff reported to Dr. Kang that he was feeling "real good" except for his financial problems which often caused depressed moods. Plaintiff also recorded that he was no longer crying, had better energy and motivation, was less depressed and had better concentration.

Plaintiff reported sleeping poorly throughout May 2005, while being worried about his financial problems. In June 2005, Plaintiff indicated that he was sleeping through the night, but that he cried a few times due to his financial and family troubles. Dr. Kang reported that Plaintiff was calmer, less depressed, and experienced fewer racing thoughts in June 2005.

The Social Security Administration requested that Dr. Shashi Arnand perform a psychological examination of Plaintiff on July 1, 2005. Dr. Arnand diagnosed Plaintiff with mood disorder with auditory hallucinations and assigned a GAF of 72.[3] (TR. 128.) Plaintiff denied experiencing any hallucinations or delusions since September 2004. Dr. Arnand reported that Plaintiff's mood and affect was appropriate, his speech was clear, he was able to remain focused on the task at hand, and his memory was intact.

In August 2005, Dr. Kang noted that Plaintiff had good days and bad days. Overall, Plaintiff reported that he was "ok" but his financial troubles continued. In

---

[3] A GAF score of 71-80 indicates that, if symptoms are present, they are transient, an expectable reaction to psychosocial stressors, and the individual has no more than slight impairment in social, occupational, or school functioning. *DSM-IV-TR* at 34.

September 2005, Plaintiff was "ok" but a "little nervous" because his Social Security claim had been denied. Plaintiff averaged 10 hours of sleep. He was occasionally depressed and reported having crying spells every three or four days. Dr. Kang noted that Plaintiff was "generally fairly stable."

In October 2005, at Mr. Balanoff's request, Dr. Gary Alvarez, a clinical psychologist at Tri-City North Lake Counseling Center, evaluated Plaintiff's ability to do work-related activities. Dr. Alvarez reported that Plaintiff could follow routine work rules, understand, remember and carry out simple job instructions, and maintain a personal appearance. However, Dr. Alvarez designated that Plaintiff's ability to make other occupational, performance, and personal-social adjustments were poor. Dr. Alvarez noted: "Anxiety and depression interfere with [Plaintiff's] concentration and attention to task. PTSD [posttraumatic stress disorder] significantly diminished his ability to cope with the public and work stress." Dr. Alvarez added that Plaintiff's "psychological functioning deteriorates rapidly under mild or stronger stress." (TR 150.)

Dr. Kang also completed the medical assessment forms in October 2005. Dr. Kang's assessment found that Plaintiff had a good or fair ability to perform most work-related activities. However, Dr. Kang agreed with Dr. Alvarez in that Plaintiff had a poor ability to deal with the public, interact with supervisors, and deal with work stress. Specifically, Dr. Kang noted that Plaintiff "may have difficulty in dealing with public/interpersonal stress in job situations." (TR. 154.)

In August and November 2005, Drs. Kladder and Neville completed a mental residual functional capacity assessment of Plaintiff for the Social Security Administration. They reported that Plaintiff was moderately limited in his ability to

understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods of time. Notwithstanding, Drs. Kladder and Neville noted that "it appears that [Plaintiff] retains the ability to perform simple, repetitive tasks on a sustained basis without extraordinary accommodations." (TR. 159.)

In November 2005, Dr. Kang noted that Plaintiff's sleep was "not good." Plaintiff reported that he broke up with his girlfriend because he could not afford to take her out. Plaintiff reported that he was not experiencing crying spells, but he complained of having chest pain. Dr. Kang recorded that Plaintiff's affect was appropriate and his speech was normal. Plaintiff also reported having depressed moods.

In December 2005, Plaintiff indicated to Dr. Kang that he was "alright" and was sleeping a "lot," sometimes all day. Plaintiff's daily activities remained the same, but several friends visited him. Dr. Kang recorded that Plaintiff was not crying but was still experiencing sadness. Plaintiff reported being depressed over the holidays.

In January 2006, Plaintiff reported to Dr. Kang that he felt that he "can't hold onto [a] job." Plaintiff was sleeping a lot but left the house to visit friends. Plaintiff reported making it through the holidays but was sad and stressed due to his poor financial situation.

In February 2006, Plaintiff reported that he was "ok." He indicated that his anxiety was sometimes good and sometimes bad. Dr. Kang noted that Plaintiff cried for the first time in a while after receiving a letter from a charity he used to support. Despite financial problems, Plaintiff sent ten dollars to the charity. Plaintiff reported that his energy was "probably low," but his daily activities were the same. He indicated that he

was sleeping about four to eight hours a night. Dr. Kang opined that Plaintiff was goal-oriented and "overall, fairly stable." (TR. 176.)

In May 2006, Plaintiff reported feeling "about the same" as he had in February 2006.

**(3) *Plaintiff's Hearing before the ALJ***

On December 21, 2007, the ALJ convened the conference hearing at which Plaintiff, his attorney, the vocational expert and Drs. Jilhewar and Coyle appeared. Plaintiff testified that he left the police department after having a nervous breakdown in September 2004. In addition to irregular sleep, Plaintiff testified to having recurring thoughts about the suicide of a boy who had lived next to him. Plaintiff reported guilt for the incident because he kept the boy's father, a fellow police officer, after work to have a conversation about his former wife. Plaintiff was the patrol sergeant and first to arrive on the scene. Plaintiff indicated that he would like to go back to his old life; however, he stated that he cannot go back to the police force. Plaintiff has not performed any work since leaving the police department but is trying to pull things back together.

Plaintiff also testified to having good days and bad days. He indicated that his general mood was determined by the amount of sleep he received the night before. Plaintiff reported sleeping a couple hours a night for half the month and approximately 12 hours the remaining nights. Plaintiff additionally testified to having crying spells and depressed moods. Plaintiff indicated that his depressed moods were often provoked when he worried about his financial situation or was reminded of his work as a police officer by the newspaper, television shows, or seeing his neighbors house while taking out the

garbage. Plaintiff acknowledged that he gained weight—maybe 20–25 pounds in recent years.

At the time of the hearing, Plaintiff was single and lived at home by himself. He previously married twice but both marriages ended in divorce. Plaintiff indicated that he has one daughter whom he financially supports, two brothers, and parents that live in Arizona. He reported that he occasionally watches football with his friends or speaks to them on the telephone. Plaintiff indicated that his daily activities included driving, reading the newspaper, watching television, and cleaning the house. He noted that he shopped at the grocery store, paid the bills, and balanced the checkbook when needed. Plaintiff indicated financial problems but managed to visit his parents in Arizona in April 2006.

Plaintiff further testified that he was taking several medications: Wellbutrin 150 milligrams, Synthroid 0.05 milligrams, Cozaar 100 milligrams, Lorazepam 1 milligram, and Viagra 100 milligrams.

Dr. Coyle testified next. Relying on the record, Dr. Coyle opined that Plaintiff had depression and anxiety, probably not posttraumatic stress disorder. He reported that Plaintiff had some limitations in terms of functioning. Specifically, Dr. Coyle testified that, extending back to September 2004, Plaintiff was moderately limited in his ability:

- to understand and remember detailed instructions;
- to carry out detailed instructions;
- to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and

9

- to respond appropriately to changes in the work setting.

(TR 260–61.) Dr. Coyle reported that Plaintiff was not significantly limited in his ability to perform other mental functions.

Dr. Jilhewar followed testifying that Plaintiff had no physical limitations on his residual functional capacity.

Finally, the vocational expert Mr. Grzesik testified. Assuming Plaintiff's vocational characteristics and the limitations as assessed by Dr. Coyle, Mr. Grzesik testified that the hypothetical individual could not perform Plaintiff's past relevant work as a police officer. However, Mr. Grzesik stated that the hypothetical individual could perform the jobs of commercial cleaner/porter (about 12,000 jobs) or material handler (about 35,000 jobs) throughout northwest Indiana. Mr. Grzesik then confirmed that the hypothetical individual as determined by Drs. Alvarez and Kang could not do Plaintiff's past relevant work or any other work.

### (4) *ALJ's Decision*

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. The ALJ found that Plaintiff had severe impairments of major depression with anxiety. However, Plaintiff's condition did not meet or equal one of the listed impairments. Plaintiff's mental impairments failed to satisfy the "A" and "B" criteria of listing 12.04 because the evidence did not suggest an especially debilitating mental impairment.

The ALJ found that Plaintiff had the residual functional capacity to make an adjustment to other work that exists in significant numbers in the national economy. The

ALJ based his conclusion on the testimony of the vocational expert, considering the claimant's age, education, work experience, and residual functional capacity. The ALJ stated that the Plaintiff's "medically determinable impairments could reasonably be expected to produce some of his alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (TR. 24.) The ALJ also opined that the Plaintiff's mental status was not as debilitating as Drs. Alvarez and Kang had suggested. The ALJ noted that the medical notes, assessment by the examining physicians, and Plaintiff's testimony actually suggested an overall improvement in Plaintiff's status with therapy and medication. While agreeing with Dr. Coyle that Plaintiff was mildly to moderately restricted in daily activities, the ALJ further reasoned that the record did not support the treating physician's assessment which indicated that the Plaintiff had a poor or marked ability to deal with the public, supervisors, or work stress.

The ALJ stated that he relied on the testimony of Dr. Coyle and gave little weight to the medical evidence provided by Drs. Alvarez and Kang. The ALJ suspected that both treating sources exaggerated the Plaintiff's limitations to a considerable extent. Further, the ALJ rejected the opinions, in part, because Dr. Alvarez failed to provide progress notes that tracked Plaintiff's limitations. The ALJ also found that Dr. Kang's medical notes, which indicated Plaintiff as appropriate, goal-directed and fairly stable, contradicted his opinion of Plaintiff's ability to work. Based on the testimony of Dr. Coyle and Mr. Grzesik, the ALJ found that the Plaintiff was unable to return to his past relevant work, but that jobs existed in significant number in the national economy that Plaintiff could perform.

## C. Standard of Review

The Social Security Act authorizes judicial review of final decisions made by the Social Security Agency. 42 U.S.C. § 405(g). Upon judicial review, the court will only consider whether the ALJ's findings are supported by substantial evidence and made under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In issuing his opinion, the ALJ must, at minimum, state his analysis of the evidence so a reviewing court can make an accurate decision. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Although an ALJ is not required to address all the evidence, "the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). In determining whether the ALJ has satisfied this burden, the court will not re-weigh evidence or make decisions of credibility. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

## D. Disability Standard

To qualify for Disability Insurance benefits the claimant must establish that he suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social

Security Administration established a five step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski*, 245 F.3d at 886. A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**E. Analysis**

Plaintiff claims that the ALJ erred by finding that he was not disabled within the meaning of the Social Security Act and denying him Disability Income benefits and Supplemental Security Income benefits. Plaintiff asserts the following arguments in support of his claim:

1. The ALJ improperly discredited and disregarded the opinions of Plaintiff's treating psychiatrist, Dr. Kang, and clinical psychologist, Dr. Alvarez;

2. The ALJ's credibility determination is flawed and provides no basis for discrediting Plaintiff's testimony; and

3. The opinion of the medical expert, Dr. Coyle, does not provide substantial evidence to support the ALJ's decision.

The Court will address each of the Plaintiff's arguments in turn.

**(1)** *Drs. Alvarez's and Kang's Opinions*

The Plaintiff first argues that the ALJ did not give sufficient weight to the mental diagnosis prepared by the Plaintiff's treating psychiatrist, Dr. Kang, and clinical psychologist, Dr. Alvarez. A treating physician's opinion is to be given controlling weight unless well-supported contradicting evidence is introduced. *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). In such a case, the weight to be given to a treating physician's opinion is a fact sensitive determination. *Id.* at 377.

In the present case, Dr. Coyle, the medical expert, provided well-supported, contradicting evidence. Drs. Alvarez and Kang opined that Plaintiff had a poor ability to deal with the public, interact with supervisors, and deal with work stress. However, Dr. Coyle found that Plaintiff was only moderately limited in a few areas of work related mental functioning due to his impairment.

The ALJ reasoned that Dr. Kang's medical notes did not suggest that the Plaintiff had a debilitating mental impairment. The ALJ concluded that the medical notes actually suggested overall improvement. The ALJ stated that he was influenced by the absence of progress notes to support the Plaintiff's limitations from Dr. Alvarez. Furthermore, the ALJ found that Dr. Kang's medical notes contradicted his own conclusion: "Dr. Kang's notes [contradict] conclusions of 'poor' or even 'fair' ability to make the performance, occupational and personal-social adjustments necessary for competitive, remunerative work activity, since the claimant is routinely described as appropriate, goal-directed and 'fairly stable' during his clinic visits." (TR. 27.)

The Plaintiff, though, contends that the ALJ came to an inaccurate conclusion by means of an irrelevant comparison. The ALJ's comparison, as noted above, was based on

Dr. Kang's medical notes. The notes reported that the Plaintiff had a poor ability to deal with the public, interact with supervisors, and deal with work stress, yet that he was routinely appropriate, goal-directed, and fairly stable during clinic visits. Contrary to Plaintiff's contention, the ALJ was not comparing "apples and oranges." The ALJ made a reasonable comparison between Plaintiff's appropriate, goal-directed, and stable behavior and his mental ability. Immediately following the comparison, the ALJ supported his conclusion by adding: "I also note the claimant's own self-accounts of daily living activities and social functioning as reflected throughout the record, and Dr. Arnand's mental status observations, contradict the considerable and sometimes extreme limitations noted in Drs. Kang's and Alvarez's reports." (TR. 27.)

On the other hand, Dr. Coyle, after reviewing the medical records, and seeing, listening to, and questioning the Plaintiff, stated that the Plaintiff was not significantly limited in his ability to perform most mental functions. Dr. Coyle indicated that Plaintiff would be subjected to some work-related restrictions due to moderate limitations in social functioning but not to the extreme degree as expressed by Drs. Alvarez and Kang. Additionally, the State Agency psychologist, Dr. Kladder, noted that the Plaintiff was only moderately limited in his mental ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods.

Since Drs. Coyle and Kladder provided well-supported contradicting evidence, the ALJ was not required to give Drs. Alvarez's and Kang's opinions controlling weight. The Court realizes that treating physicians may develop a better understanding of a patient's impairments. However, "the fact that the claimant is the treating physician's

patient also detracts from the weight of that physician's testimony, since, as is well known, many physicians will often bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).

In the alternative, Plaintiff argues that the ALJ should have considered granting Plaintiff a closed period of disability from the onset date, September 28, 2004, until October 24, 2005. Plaintiff reasons that the scope of Dr. Coyle's opinion related only to the period from October 24, 2005, the date that Drs. Alvarez and Kang assessed Plaintiff's ability to work, until December 21, 2006, and did not apply to 27 months back to the onset date.

Plaintiff's argument fails to persuade the Court. While the ALJ did not address the closed period as a stand alone issue, his opinion provided substantial basis to affirm the decision in its entirety. In the decision, the ALJ weighed the evidence and felt that Drs. Alvarez and Kang exaggerated Plaintiff's limitations considerably. Dr. Coyle was privy to the opinions of Drs. Alvarez and Kang on Plaintiff's ability to work on October 24, 2005, but he also considered other sources of evidence—including the treatment notes from Dr. Kang which date back to January 2005—in evaluating Plaintiff's impairment. Furthermore, the ALJ's decision traces Plaintiff's medical history back to the day of his nervous breakdown, September 28, 2004. The decision gives no indication to this Court that the ALJ failed to consider all possible remedies to Plaintiff extending back to the onset date.

Thus, the ALJ's decision and his reliance on the opinions of Dr. Coyle were permissible.

**(2)** *Credibility Analysis*

Plaintiff next argues that the ALJ's credibility determination was flawed and that there was no basis for the ALJ to discredit the Plaintiff's testimony.

The Seventh Circuit Court of Appeals has consistently ruled that an ALJ's credibility determination, unless clearly wrong, will be upheld. "Because the ALJ is in the best position to observe witnesses, we will not disturb [his] credibility determinations as long as they find some support in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001). Therefore, "we will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Here, the ALJ stated in his decision that he considered the Plaintiff's testimony, the entire medical records in accordance with the requirements of 20 CFR 404.1529 and 416.929 and Social Security Rulings 96–4p and 96–7p, and the opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96–2p, 96–5p, and 06–3p. Then, the ALJ noted: "After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce some of his alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (TR. 24.)

The ALJ supported his credibility determination by discussing Plaintiff's testimony and the medical notes recorded by Drs. Alvarez and Kang from January 2005 to May 2006. The ALJ compared Plaintiff's purported limitations with his daily activities, the medical opinions of Dr. Coyle, the psychological consultative evaluation

with Dr. Arnand, and the medical evaluation of the State agency psychologist, Dr. Kladder. The ALJ then concluded that the evidence actually indicated that the Plaintiff was "fairly stable," had a "less depressed mood," and suggested "overall improvement."

Since the record provides sufficient evidence to establish that the ALJ's credibility determination was not patently wrong, the Court will not reverse the ALJ's credibility determination.

**(3)** *Substantial Evidence in Support of Decision*

Lastly, Plaintiff argues that the medical expert, Dr. Coyle, failed to provide substantial evidence in support of the ALJ's decision. According to Plaintiff, Dr. Coyle's testimony did not specifically address the question of his ability to deal with the public, supervisors, or work stress; and, the form which Dr. Coyle completed and which the ALJ read in propounding his hypothetical question to the vocational expert is not in the record.

The ALJ must base his decision upon substantial evidence. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

Here, Dr. Coyle provided substantial evidence to allow the ALJ to reasonably determine that Plaintiff was not disabled. Dr. Coyle specifically addressed Plaintiff's ability to function in several work-related and social situations during the hearing. Dr. Coyle testified that Plaintiff was not significantly limited in the ability to interact appropriately with the public, not significantly limited in the ability to accept instructions and respond appropriately to criticism from supervisors, and moderately limited in the

ability to respond appropriately to changes in the work setting. In fact, Dr. Coyle found Plaintiff's mental residual functional capacity to be no more than moderately limited in ability to perform any work-related functioning.

The fact that Dr. Coyle's mental residual functional capacity assessment form was not in the record does not support Plaintiff's argument. Dr. Coyle's mental residual functional capacity assessment of the Plaintiff was orally reported to the ALJ and Mr. Balanoff during the hearing on December 21, 2005. Dr. Coyle's assessment of Plaintiff was then presented to the vocational expert, Mr. Grzesik. At the request of the ALJ, copies of the form were made during the hearing, but they do not appear in the record. During the hearing, Mr. Balanoff had the opportunity to request that the form be submitted into evidence; however, he declined. When asked by the ALJ whether he need copies of the form, Mr. Balanoff stated, "No . . . I'm familiar with the form. I've got it etched in my brain." (TR. 257.) The Court, therefore, finds that the record is satisfactory.

Thus, the Court finds that there was substantial evidence provided by Dr. Coyle to support the ALJ's decision.

**E. Conclusion**

The Court AFFIRMS the Administrative Law Judge's decision.

SO ORDERED on August 4, 2009.

s/ Joseph S. Van Bokkelen  
JOSEPH S. VAN BOKKELEN  
UNITED STATES DISTRICT JUDGE  
HAMMOND DIVISION